El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
Mediante el presente recurso nos corresponde interpre-tar el Art. 21 de la Ley Núm. 70 de 23 de junio de 1978 (Art. 21 de la Ley Núm. 70-1978),(1) según enmendada,(2) disposición que no ha sido objeto de análisis anteriormente por esta Curia. Específicamente, nos toca resolver cuál es el procedimiento requerido por esa disposición legal y por el Reglamento Núm. 5880 de la Autoridad de Desperdicios Sólidos de Puerto Rico y del Departamento de Hacienda, de 18 de noviembre de 1998 (Reglamento 5880),(3) al soli-citarse créditos contributivos para una inversión dirigida a *719 renovar o expandir sustancialmente una “facilidad” (insta-lación) de reciclaje, la cual ya había iniciado operaciones y previamente había sido certificada como exenta por la Au-toridad de Desperdicios Sólidos (Autoridad o la peticio-naria). Del mismo modo, debemos determinar si conforme a las antedichas disposiciones legales, la cuantía que se está invirtiendo para llevar a cabo los proyectos de renova-ción o expansión sustancial, es elegible para recibir los cré-ditos contributivos solicitados.
I
La compañía IFCO Recycling, Inc. (IFCO o la recurrida) se incorporó en el Departamento de Estado de Puerto Rico en 1997. Ese mismo año solicitó a la Autoridad que, según lo dispuesto en el Art. 21 de la Ley Núm. 70-1978 se le certificara como facilidad exenta por sus actividades de re-ciclaje parcial. La Autoridad evaluó la solicitud de IFCO, a la luz de lo dispuesto en el Art. 21(g) de la Ley Núm. 70-1978 (12 L.P.R.A. sec. 1318a(g)), de la Carta Circular 97-05 del Departamento de Hacienda de 14 de abril de 1997 y del Reglamento 5880. Determinó que, luego de examinar las disposiciones legales pertinentes, entendía que las activi-dades de reciclaje llevadas a cabo por IFCO se enmarcaban en la alternativa de “otras tecnologías aprobadas por la Autoridad que sean ambientalmente seguras”, por lo que la certificó como “facilidad exenta”.(4) En virtud de esa Cer-tificación, IFCO disfruta de una exención contributiva por sus actividades de reciclaje parcial(5) y para el servicio de distribución comercial y mercantil de artículos para mer- *720 cados fuera de Puerto Rico, según las Secs. 2(d)(10) y 2(i)(l) de la Ley Núm. 135-1997 (13 L.P.R.A. secs. 10101(d)(10) y 10101(i)(l)).(6) Una vez reconocida como una facilidad exenta, se le concedió un crédito contributivo del cincuenta por ciento (50%) de la inversión elegible de tres millones de dólares ($3,000,000), por lo que recibieron un crédito montante a un millón quinientos mil dólares ($1,500,000).(7) Mediante carta de 18 de marzo de 1999, el Secretario de Hacienda reconoció el derecho de IFCO a re-clamar ese crédito.
Con fecha de 30 de julio de 2001, IFCO presentó ante la Autoridad una enmienda a la Certificación para ampliar la inversión elegible, dado que se aprestaba a aportar a sus actividades de reciclaje una cantidad adicional de un mi-llón quinientos mil dólares ($1,500,000). Reclamó, por lo tanto, un crédito contributivo ascendente a setecientos cin-cuenta mil dólares ($750,000). La nueva cantidad inver-tida estaría destinada a la construcción de veinticinco mil pies cuadrados (25,000 p2) adicionales, que acrecentarían la capacidad de almacenamiento y ayudarían en el manejo de todas las toneladas de materiales que serían reciclados. Esa solicitud fue aprobada por la Autoridad como una en-mienda a la certificación, dado que al momento de su pre-sentación, la recurrida aún no había iniciado la construc-ción de sus instalaciones de reciclaje. (8) Además, en varias *721 ocasiones IFCO solicitó enmiendas a la certificación con el fin de extender el tiempo necesario para concluir las cons-trucciones e iniciar las operaciones.(9)
El 7 de octubre de 2004, la Autoridad certificó el co-mienzo de las operaciones de IFCO. Para ese momento, IFCO contaba con activos ascendentes a dieciocho millones setecientos treinta y tres mil setecientos veintiocho dólares ($18,733,728), producto de una fusión efectuada el 31 de octubre de 2003 con la compañía Industrial Fibers Corp.
El 5 de noviembre de 2004, IFCO solicitó otra enmienda a la certificación de facilidad exenta con el fin de que se reconociera como inversión elegible una contribución adi-cional por la cantidad de dos millones cien mil dólares ($2,100,000). Esa inversión iba dirigida a la adquisición de una maquinaria especializada tipo streamline, la cual ha-bría de utilizarse directamente en la operación de reciclaje de la recurrida y permitiría aumentar el volumen de material que sería procesado a setenta y ocho mil (78,000) toneladas al año.
No obstante, el 10 de junio de 2005, el director ejecutivo de la Autoridad le indicó a IFCO que lo peticionado no podía ser considerado como una enmienda a la certifica-ción, debido a que la solicitud fue presentada luego de ha-ber concluido la construcción y de haberse iniciado las ope-raciones en la instalación, lo que, según las disposiciones del Reglamento 5880, impedía el curso de acción solicitado. Manifestó que, en todo caso, la nueva inversión podría ser considerada como una expansión sustancial de la instala-ción, de ésta ser elegible según los parámetros del *722 Reglamento. IFCO solicitó una reconsideración de la deter-minación de la Autoridad. Sin embargo, ésta se sostuvo en su decisión.
Así las cosas, y no habiéndose autorizado la enmienda a la Certificación, el 2 de septiembre de 2005 IFCO presentó ante la consideración de la Autoridad una “Solicitud de cer-tificación de expansión substancial de facilidad exenta y créditos contributivos por inversión”, según indicado por la Autoridad. En esta, expuso que se disponía a aportar una cantidad en efectivo para la adquisición de una maquina-ria y equipo streamline por un valor de dos millones cien mil dólares ($2,100,000). Alegó que esa maquinaria era ne-cesaria para expandir sustancialmente el proyecto de reci-claje y para aumentar la capacidad de recuperar, reciclar y reusar nuevos materiales tales como el papel, cartón, vi-drio, aluminio, metales ferrosos y cualquier otro material reciclable. Declaró que, dada la naturaleza de la actividad que se disponían a realizar, la inversión debía ser conside-rada como una elegible, en virtud de las disposiciones del Art. 21 de la Ley Núm. 70-1978, por lo que los inversionis-tas tenían derecho a reclamar el crédito correspondiente. Solicitó, por lo tanto, que se les otorgara un crédito del cincuenta por ciento (50%) del dinero invertido en la ex-pansión sustancial de la facilidad exenta, equivalente a un millón cincuenta mil dólares ($1,050,000).
Posteriormente, y con fecha de 6 de diciembre de 2005, IFCO presentó una enmienda a su solicitud de expansión sustancial, con el propósito de aumentar la inversión pro-puesta a un total de cinco millones cien mil dólares ($5,100,000). Para fundamentar su solicitud, en la página 4 de su escrito, IFCO se expresó en los términos siguientes:
La Inversión Adicional cualifica como Inversión Elegible se-gún el artículo 21(j)(4) de la Ley y la Sección 2-10 del Reglamento. La inversión en la maquinaria y equipo “streamline” ($2,100,000) así como la inversión en la construcción de áreas de almacenaje y estacionamiento y la compra de equipos recolectores ($3,000,000), permitirá a la Peticionaria expandir *723 su proyecto de reciclaje y aumentar la capacidad de recuperar, reciclar y almacenar nuevos materiales tales como el vidrio, aluminio, metales ferrosos y cualquier otro material reciclable.
La Inversión Adicional se utilizará par [a] la adquisición de la maquinaria y equipo tipo “st[r]eamline,” (incluyendo insta-lación eléctrica) necesaria para instalar dicha maquinaria de nueva tecnología en la Facilidad Exenta, a la construcción de las mejoras en la Finca Longo de Caguas y su alquiler, y a la compra de equipo de recolectores. La inversión en la maquina-ria y equipo “streamline” y los recolectores, así como el desa-rrollo y construcción de mejoras en la parcela en el Barrio Longo en Caguas, constituye una inversión por la cual no se han otorgado créditos contributivos por Inversión anterior-mente bajo la Sección 2-10 del Reglamento. Enmienda a soli-citud de certificación de expansión substancial de facilidad exenta y créditos contributivos por inversión, págs. 4-5.
Argumentó la recurrida que la inversión adicional que habría de realizarse cumplía con todas y cada una de las disposiciones de la Ley Núm. 70-1978 y el Reglamento 5880, por lo que los inversionistas tenían derecho a un cré-dito por inversión ascendente a dos millones quinientos cincuenta mil dólares ($2,550,000).
Luego de evaluar la solicitud enmendada, la Autoridad encontró que la actividad propuesta de expansión sustan-cial que realizaría IFCO no era elegible para recibir el be-neficio de los créditos contributivos por inversión, según lo dispuesto en la See. 2-5 del Reglamento 5880, pág. 2. Fun-damentó su decisión únicamente en el hecho de que en nuestra Isla ya existían entidades con una operación e in-fraestructura similar a la que IFCO proponía en su solicitud.(10)
El 23 de febrero de 2006, IFCO solicitó reconsideración de dicha denegatoria. Específicamente, incluyó como sú-plica:
a) Que se determine que IFCO ha realizado una expansión o renovación sustancial de acuerdo a la Sección 21(g) de la Ley *724 70 y de las Secciones 2-1 y 2-13 del Reglamento 5880 teniendo ya una Certificación de Facilidad Exenta y que por lo tanto no tenga que cumplir con los requisitos de volver a tener que demostrar que cualifica bajo otras tecnologías ambiental-mente seguras bajo el Artículo 21(g)(3) de la Ley 70 y la Sec-ción 2-10 del Reglamento 5880.(11)
b) En la alternativa que se certifique la facilidad de “Single Stream” como una Facilidad Exenta dentro de la ya existente Certificación de Facilidad Exenta a base de que la tecnología a ser utilizada reúne todos los requisitos establecidos en el Ar-tículo 21(g) de la ley y el Artículo 2-10 del Reglamento 5880. (Énfasis en el original y escolio nuestro.). Carta de 23 de fe-brero de 2006, págs. 7-8.
La Autoridad, luego de acoger y evaluar la reconsidera-ción de IFCO, emitió su decisión en carta fechada el 2i de junio de 2006. En ella, mantuvo su determinación inicial de no otorgar los nuevos créditos por inversión. Entre los fundamentos esgrimidos por la Autoridad para sustentar su decisión se encuentran: (i) que la operación e infraes-tructura de la recurrida era similar a la de otras industrias existentes en el país; (ii) que estaba ubicada cerca de otra instalación que contaba con una maquinaria parecida de single stream,-, (iii) que ya había recibido sobre dos millones doscientos mil dólares ($2,200,000) en créditos contributi-vos y (iv) que parte del proyecto incluía la construcción de un área de estacionamiento, lo cual no era considerado por la Autoridad como una inversión directamente relacionada con el reciclaje, para poder justificar la concesión de crédi-tos contributivos. Además, la Autoridad sostuvo que IFCO no había cumplido con el procedimiento establecido en el Art. 21 de la Ley Núm. 70-1978 y en el Reglamento 5880, mediante el cual se tenían que volver a evaluar todas las disposiciones relativas a la certificación de entidades como facilidades exentas.
Inconforme con tal determinación, IFCO acudió me-diante un recurso de revisión administrativa ante el Tribu *725 nal de Apelaciones (TA). Alegó que la Autoridad había errado al analizar la solicitud de expansión sustancial se-gún los parámetros de la See. 2-5 del Reglamento 5880 y al determinar que la inversión adicional no era elegible para recibir créditos contributivos.
Luego de varios escritos sometidos por ambas partes, el TA revocó la decisión de la Autoridad en una sentencia emitida el 29 de diciembre de 2006.(12) Expuso lo siguiente como conclusión al primer señalamiento de error plan-teado:
Nos resulta claro, que sólo cuando se concluye que la expan-sión envuelve una actividad diferente, es que procedería eva-luar una propuesta de expansión bajo los criterios necesarios para calificar como una Facilidad Exenta. Si no existe tal diferencia, entonces lo que procede es indagar si el proyecto de expansión llena lo requerido por el Reglamento en la “Sección 2-13 Renovación o Expansión Sustancial”. El volver a calificar el proyecto de expansión o renovación como una Facilidad Exenta, cuando no existe cambio de la actividad por la cual antes se calificó la facilidad como Facilidad Exenta, no lo au-toriza ni requiere la ley y, además, conlleva una demora y gastos adicionales que no se justifican cuando la naturaleza de la operación es la misma que la del proyecto original, el cual luego de evaluación por la Autoridad obtuvo Certificación de Facilidad Exenta. Sentencia del TA, págs. 22-23.
En cuanto al segundo señalamiento de error, el TA con-cluyó que los fundamentos utilizados por la Autoridad para decidir que la inversión que IFCO habría de realizar no era elegible para recibir créditos contributivos, no encontraban apoyo en la ley ni en el Reglamento. En particular, mani-festó el foro apelativo intermedio que en ninguna parte de la Ley ni del Reglamento se impone un límite cuantitativo a los créditos contributivos que han de otorgarse, ni exis-ten limitaciones sobre la cantidad de plantas de reciclaje por área geográfica. En cuanto a la inversión en un área de estacionamiento, estableció el TA que ésta comprendía una *726 actividad relacionada al reciclaje, dado que por el tipo de operaciones que se realizarán, se necesitan áreas donde: (1) recibir los camiones con desperdicios sólidos y donde estacionarlos en caso de que no puedan ser descargados inmediatamente; (2) almacenar su contenido si no se pue-den procesar prontamente, y (3) donde se puedan almace-nar temporalmente los materiales reciclados, hasta acu-mular las cantidades necesarias que serán despachadas a los clientes.
Además de las expresiones atinentes a que la Autoridad se basó en criterios no pertinentes al denegar los créditos contributivos, así como que los fundamentos esgrimidos no encontraban base en la ley ni en el Reglamento, el foro apelativo intermedio manifestó que la inversión cumplía con los requisitos establecidos en ley(13) para evaluar un proyecto de expansión sustancial. Decretó, en primer lu-gar, que se trataba de una inversión que habría de reali-zarse en una instalación de reciclaje y que, además, la cuantía de la inversión era mayor al veinticinco por ciento (25%) del justo valor en el mercado de todos los activos de la instalación existente. Por lo tanto, revocó la resolución de la Autoridad y le ordenó que certificara al Departa-mento de Hacienda que el proyecto de expansión sustan-cial de IFCO era acreedor del crédito contributivo provisto en el Art. 21 de la Ley Núm. 70-1978.
En desacuerdo con el dictamen del TA, la Autoridad acudió oportunamente ante nos planteando la comisión de los errores siguientes:
1. Erró el Tribunal de Apelaciones al determinar que los inver-sionistas privados para el establecimiento, renovación o ex-pansión de plantas de reciclaje de desperdicios sólidos tienen como materia de derecho un crédito contributivo del 50% de su aportación en efectivo, sin que la Autoridad tenga que evaluar si la Industria cualifica o no como Facilidad Exenta.
2. Erró el Tribunal de Apelaciones al determinar que la solici-tud de Certificación de Facilidad Exenta por Expansión y/o *727 Renovación Sustancial de IFCO no tiene que ser calificada ni evaluada como Facilidad Exenta por haber obtenido una Cer-tificación por una actividad anterior.
3. Erró el Tribunal al resolver que la inversión adicional [a] hacerse por IFCO en la Renovación o Expansión de su em-presa es elegible para créditos contributivos por inversión bajo el Art. 21 y el Reglamento 5880. Certiorari, pág. 8.
Examinado el certiorari, decidimos expedir el recurso solicitado y contando con la comparecencia de ambas par-tes, procedemos a resolver.
II

Art. 21 de la Ley Núm. 70-1978 y otras disposiciones lega-les aplicables

La Ley Núm. 70-1978 creó la Autoridad de Desperdicios Sólidos para que, entre otros propósitos, planificara, financiara y operara los servicios de trasbordo, procesamiento, recuperación y disposición final de los desperdicios sólidos para el uso de los municipios y las agencias públicas y privadas. 12 L.P.R.A. sec. 1305(d). Posteriormente, la Asamblea Legislativa, consciente del problema que representa tener un alto volumen de desperdicios sólidos que se generan diariamente y una pobre capacidad receptora en los vertederos, creó, mediante la Ley Núm. 70-1992 (12 L.P.R.A. see. 1320 et seq.),(14) un programa dirigido hacia la reducción y el reciclaje de los desperdicios sólidos. El programa estaba enfocado primordialmente en la disminución del volumen de desperdicios que se depositaban diariamente en los vertederos y en el desarrollo de un mercado de material reciclado. En la Ex-posición de Motivos de la Ley Núm. 70-1992 se expuso:
... Urge implantar unas soluciones ambientalmente seguras que redunden en la reducción del volumen de desperdicios só-lidos que se tienen que disponer.

*728
Los sistemas de reducción y reciclaje en combinación con el uso menos intensivo de los vertederos representan una alterna-tiva viable para Puerto Rico ....

La Asamblea Legislativa de Puerto Rico entiende que el país necesita implantar sistemas regionales para la reducción y el reciclaje de desperdicios sólidos, estimulando la participación de la empresa privada en la construcción y operación de las instalaciones necesarias .... (Enfasis nuestro.) 1992 (Parte 1) Leyes de Puerto Rico 315, 318-319.
Para lograr el propósito de desarrollar e implantar estrategias económicamente viables y ambientalmente seguras que resulten en la disminución del volumen de desperdicios sólidos, el Art. 3 de la Ley Núm. 70-1992 (12 L.P.R.A. sec. 1320a) contempló, entre otras medidas, la concesión de incentivos a las empresas participantes para estimular la recuperación de material reciclable y alentar la participación de la empresa privada en la construcción y operación de instalaciones de recuperación y reciclaje. Igualmente, impuso como una de las responsabilidades de la Autoridad, además de estimular la participación de la empresa privada en proyectos de reducción y reciclaje, el promover el fortalecimiento y la expansión de todas aquellas industrias que estuvieran en operación en ese momento. Art. 4 de la Ley Núm. 70-1992 (12 L.P.R.A. see. 1320b).
Del mismo modo, mediante el Art. 18 de la Ley Núm. 70-1992 (12 L.P.R.A. sec. 1320(p)) se implantó un programa de incentivos económicos que disponía que la Administración de Fomento Económico otorgaría incentivos contributivos para promover el establecimiento de industrias de reciclaje o de industrias que utilizaran el material reciclado para la confección de sus productos. Ese precepto, además, le imponía a la Autoridad el deber de promover el desarrollo de incentivos contributivos adicionales a los provistos en esa ley para promover el desarrollo de ese tipo de industrias.
Con el paso de los años, y aún abrumados con la *729 cantidad de desperdicios sólidos producidos diariamente en la Isla, el 20 de enero de 1995 se aprobaron unas en-miendas a la Ley Núm. 70-1978, mediante la Ley Núm. 15-1995. Entre éstas se añadió el Art. 21, con el propósito de conceder créditos contributivos a toda aquella persona o entidad que realizara una inversión en instalaciones dedi-cadas a la disposición y/o el tratamiento de los desperdicios sólidos. En la Exposición de Motivos de la Ley Núm. 15-1995 (1995 (Parte 1) Leyes de Puerto Rico 130) se expresó que la incorporación del atractivo contributivo tenía la fi-nalidad de fomentar la actividad industrial para lograr un manejo adecuado de los desperdicios sólidos.
El Art. 21 de la Ley Núm. 70-1978, según aprobado, concede el derecho a obtener los créditos contributivos por inversiones realizadas en instalaciones de reducción, dis-posición y/o tratamiento de los desperdicios sólidos, sujeto a ciertas disposiciones de la Ley. En particular, establece el Art. 21 de la Ley Núm. 70-1978 en su inciso (g) que serán consideradas instalaciones de reducción, disposición y/o tratamiento de desperdicios sólidos: (i) los negocios exentos según la Sec. 2(e)(24) de la Ley de Incentivos Contributivos de Puerto Rico”(15) y según el Art. 1(d)(9) y (e)(24) de la Ley de Incentivos Contributivos de 1998;(16) (ii) los dedicados a instalaciones de rellenos sanitarios; (iii) los que produzcan energía mediante fuentes renovables limpias,(17) y (iv) cualquier otra tecnología aprobada por la Autoridad que sea ambientalmente segura. Toda industria que lleve a cabo alguna de las actividades enumeradas puede, con-forme al procedimiento establecido, solicitar ser cualifi-cada como una “facilidad exenta” para efectos de recibir los beneficios de los créditos contributivos por inversión.
De la misma forma, y en lo pertinente al caso ante *730 nos, detalla el Art. 21(j), 12 L.P.R.A. sec. 1318a(j), que po-drán ser consideradas inversiones elegibles, para efectos de recibir los créditos contributivos:
(1) La cantidad de efectivo que haya sido aportada a una facilidad exenta para ser utilizada en una facilidad de reduc-ción, disposición y/o tratamientos de desperdicios sólidos a cambio de: (i) acciones en la corporación, si la facilidad exenta es una corporación, o (ii) la participación, o el aumento en la participación, en una sociedad o empresa en común.
(4) Sólo se consideran como inversiones elegibles aquellas inversiones cuyos fondos son utilizados en su totalidad única y exclusivamente para la construcción de una facilidad de re-ducción, disposición y/o tratamiento de desperdicios sólidos nueva o para la renovación o expansión sustancial de la faci-lidad de reducción, disposición y/o tratamiento de desperdicios sólidos existente, según definido en esta sección. Cualquier otra inversión cuyos fondos no sean utilizados directamente y en su totalidad para la construcción, renovación o expansión sustancial de una facilidad exenta, quedará excluida de la de-finición de inversión elegible de esta sección. En el caso de que se efectúe una de las aportaciones descritas en las cláusulas (1) o (2) del inciso (j) de esta sección, dicha aportación se con-siderará como inversión elegible sólo si dicha inversión se hace en la emisión primaria de las acciones o participaciones.
Una vez aprobada la ley, y puesta en vigor, se aprobó una serie de enmiendas con el propósito de continuar incentivando la participación de la empresa privada en el manejo de los desperdicios sólidos. Como ejemplo, cuando la Ley Núm. 15-1995 fue aprobada inicialmente, disponía en su inciso (b), que la cantidad máxima del crédito por inversión que estaría disponible a los inversionistas no podía exceder del diez por ciento (10%) del costo total del proyecto o cincuenta por ciento (50%) del efectivo aportado por éstos, lo que fuera menor. Sin embargo, según plasmado en la Exposición de Motivos de la Ley Núm. 104-1996, P. de la C. 2533, “la Asamblea Legislativa de Puerto Rico ent[endía] necesaria la aprobación de [una] enmienda a la Ley de la Autoridad de Desperdicios Sólidos en Puerto Rico, con el propósito de flexibilizar y desarrollar las inver- *731 siones en los proyectos relacionados con la disposición de desperdicios sólidos”. (Enfasis nuestro.) Así, pues, la Ley Núm. 104-1996 enmendó el Art. 21(b), para disponer que la cantidad máxima del crédito por inversión que estaría dis-ponible a los inversionistas, por cada proyecto, sería del cincuenta por ciento (50%) del efectivo aportado por éstos, disposición que resultaba más beneficiosa a los inver-sionistas.
El 18 de noviembre de 1998 fue aprobado el Reglamento 5880 promulgado para regir la concesión de créditos contributivos por inversión en facilidades exentas, según los términos y las disposiciones del Art. 21 de la Ley Núm. 70-1978. Por lo pertinente que resultan algunas de las secciones del Reglamento para la dilucidación de la controversia ante nos, a continuación haremos una breve exposición de las mismas. Dispone lo siguiente la See. 2-5 de ese Reglamento en su parte pertinente:
Facilidad Exenta significa cualquier facilidad de disposición y/o tratamiento de desperdicios sólidos, según dicho término se define en el apartado (g) del Artículo 21 de la Ley, que obtenga una certificación emitida por el Director Ejecutivo a tenor con las disposiciones de la Ley y de la Sección 3 de este Reglamento incluyendo, pero sin limitarse a:
a) Negocios Exentos bajo la Sección 2(e)(24) de la Ley Núm. 8 de 24 de enero de 1987, según enmendada, conocida como “Ley de Incentivos Contributivos de Puerto Rico del 1987”, la Sección 2(e)(24) de la Ley Núm. 135 de 2 de diciembre de 1997, conocida como “Ley de Incentivos Contributivos de 1998”, o cualquier ley sucesora de naturaleza análoga;
b) Aquellas actividades que se dediquen a facilidades de re-llenos sanitarios ....
c) Otras tecnologías aprobadas por la Autoridad. Estas tie-nen que estar en armonía con el Plan Regional de Infraestruc-tura para el Reciclaje y Disposición de los Desperdicios Sólidos en Puerto Rico, aspecto a determinarse por la Autoridad. Es-tas deberán promover la reducción, re[ú]so y reciclaje de los desperdicios sólidos en Puerto Rico, utilizar una tecnología ambientalmente segura y probada, y someter evidencia al respecto. Además, deberá cumplir con todas las reglamenta-ciones estatales y federales aplicables. *732 La Autoridad, a su discreción, podrá tomar en consideración cualesquiera otros factores que estime sean pertinentes para tal determinación, considerando los mejores intereses econó-micos y sociales del Pueblo de Puerto Rico. Id., pág. 2.
De acuerdo con lo anterior, para que una instalación de disposición y/ó tratamiento sea certificada como exenta debe, además de realizar alguna de las actividades citadas en la sección que antecede, llevar a cabo el procedimiento establecido en la See. 3 del mismo cuerpo legal.
La See. 3 del Reglamento 5880 establece el procedimiento que deben seguir aquellas industrias que interesen ser certificadas como facilidades exentas. La sección establece:
... Toda persona o entidad que interese una determinación de Facilidad Exenta bajo la Ley deberá someter conjuntamente con una solicitud los siguientes documentos, según sean apli-cables:
(a) Una declaración jurada que contenga, en forma deta-llada y actualizada, la siguiente información:
(1) Nombre, dirección y número de seguro social de la persona o entidad que solicita la Certificación de Facilidad Exenta.
(2) Nombre y dirección del representante, si alguno.
(3) Naturaleza de la Facilidad Exenta.
(4) Nombre de los Inversionistas y sus números de seguro social, así como del promotor, presidente o socio gestor.
(5) Localización o ubicación de la Facilidad Exenta.
(6) Disposiciones legales bajo las cuales se solicita la Cer-tificación de Facilidad Exenta y explicación de por qué califica para la misma.
(7) Un inventario de toda la propiedad mueble e inmueble que se proponga utilizar en la Facilidad Exenta.
(8) Número de empleos directos permanentes a tiempo completo que genera o generará la Facilidad Exenta y término dentro del cual se generarán dichos empleos.
(9) Número de empleos parciales que genera o generará la Facilidad Exenta y término dentro del cual se generarán dichos empleos.
(10) Monto de la nómina.
(11) Inversión realizada y/o que se realizará (descripción, procedencia y cuantía), incluyendo:
*733 (a) presupuestos preparados para propósitos de estu-dios de viabilidad o para propuestas de construcción, en los casos en que sea aplicable, carta de términos (“term sheet”) de la institución financiera que proveerá financiamiento y
(b) estimado del crédito contributivo que estará dispo-nible para los Inversionistas, y una propuesta de la forma en que este crédito se distribuirá.
(12) En los casos de Facilidades Nuevas, fechas estimadas en que comenzará la construcción y comenzará sus operacio-nes o, en los casos de Facilidades Existentes, fechas estimadas en que comenzará y finalizará su Renovación o Expansión Sustancial.
(b) Si es una corporación doméstica, una copia del certifi-cado de incorporación emitido por el Departamento de Esta-do ....
(c) Copia de los estados financieros auditados de los últimos dos años contributivos en los casos de Facilidades Existentes que emprendan una renovación sustancial, o, en los casos de Facilidades Nuevas, copia de los estados financieros sin audi-tar del último año contributivo del Desarrollador.
(d) Una certificación negativa del (i) Negociado de Recauda-ciones, (ii) Negociado de Control de Puertos, (iii) Centro de Recaudación de Ingresos Municipales, y, en el caso de Facili-dades Existentes solamente, (iv) Departamento del Trabajo y Recursos Humanos y, (v) Corporación del Fondo del Seguro del Estado, en el sentido de que ni el peticionario ni los inversio-nistas adeudan contribuciones, impuestos, arbitrios o dere-chos de clase alguna. Si el peticionario es una Facilidad Nueva, o nunca ha rendido planillas de contribución sobre in-gresos ni pagado derechos sobre ninguna de las áreas cubier-tas en este inciso, la certificación negativa correspondiente de-berá identificar al negocio como Facilidad Nueva o explicar las razones por las cuales no se han pagado los derechos correspondientes. Ninguna persona natural o jurídica que adeude contribuciones al erario podrá beneficiarse de los cré-ditos por inversión provistos por la Ley y este Reglamento, a menos que esté acogida y cumpliendo con un plan de pagos debidamente aprobado por el Departamento de Hacienda.
(e) Permiso de uso, de construcción o de ubicación según la etapa en que se encuentre el proyecto.
(f) Patente Municipal (en el caso de Facilidades Existentes solamente).
(g) Descripción de las operaciones de la Facilidad Exenta, estrategia de ventas, clientes y flujograma de los procesos a utilizarse.
(h) Certificado de seguro de responsabilidad pública expe- *734 dido por una agenda certificada por la Oficina del Comisio-nado de Seguros de Puerto Rico (en el caso de Facilidades Existentes solamente).
(i) Cualquier otro documento o información que el peticiona-rio estime conveniente someter o que el Director Ejecutivo le requiera por ser necesario para llevar a cabo un examen com-pleto y cabal de la solicitud del peticionario.
El peticionario tendrá que someter la solicitud correspon-diente, en original y dos (2) copias, dirigida a la atención del “Director Ejecutivo de la Autoridad de Desperdicios Sólidos”, acompañada de los documentos complementarios, por correo o personalmente. Al radicarse la solicitud en la Autoridad para la consideración del Director Ejecutivo, la misma deberá estar acompañada también de un cheque certificado o giro bancario o del Servicio de Correos de los Estados Unidos pagadero a la “Autoridad de Desperdicios Sólidos” por la cantidad de qui-nientos dólares ($500.00).
Además, el peticionario deberá someter una copia de la so-licitud simultáneamente en la División de Exención Contribu-tiva del Negociado de Asistencia Contributiva y Legislación del Departamento de Hacienda, acompañada de un cheque o giro postal a nombre del Secretario de Hacienda, de cuatro-cientos dólares ($400.00), cantidad que el Departamento de Hacienda cobra por esta clase de opiniones, según lo provisto en la Ley Núm. 15 del 20 de julio de 1990 y su Reglamento, según enmendado. Estas cantidades podrán ser modificadas de tiempo en tiempo mediante reglamento o carta circular a esos efectos.
Una vez la solicitud esté debidamente radicada ante el Director Ejecutivo y el Secretario, el Director Ejecutivo determi-nará la elegibilidad del peticionario como Facilidad Exenta tomando en cuenta la naturaleza de las facilidades de dispo-sición y/o tratamiento de desperdicios sólidos, el número de empleos generados; y cualesquiera otros factores que, a discre-ción del Director Ejecutivo, sean pertinentes para tal determi-nación, considerando los mejores intereses económicos y socia-les del Pueblo de Puerto Rico.
Luego de que el Director Ejecutivo determine que el peticio-nario califica como una Facilidad Exenta lo notificará al Secretario. El Secretario determinará la procedencia y cuantía de los créditos por inversión solicitados, y, de determinar que los mismos proceden, emitirá su recomendación al Director Ejecutivo. El Director Ejecutivo emitirá la Certificación de Fa-cilidad Exenta mediante comunicación escrita al Peticionario y al Secretario. La Certificación detallará todas las condicio-nes bajo las cuales es emitida, incluyendo:
*735 (a) La fecha límite de comienzo de las operaciones de la Fa-cilidad Exenta en el caso de Facilidades Nuevas, o para com-pletar la Renovación o Expansión Sustancial en el caso de Fa-cilidades Existentes, la cual salvo en casos excepcionales, no podrá exceder de un año desde la fecha de la Certificación de Facilidad Exenta;
(b) El costo total de la Facilidad Exenta y las partidas que podrán considerarse como parte del costo de la misma;
(c) Cantidad máxima tentativa del crédito por inversión dis-ponible para la Facilidad Exenta, y
(d) Disposiciones relativas al recobro de los créditos conce-didos en caso de que el peticionario no complete el proyecto propuesto dentro del término establecido.
En los casos en que el Director Ejecutivo determine que el peticionario no califica como una Facilidad Exenta, éste noti-ficará por escrito la denegación mediante correo certificado, expresando las razones en las cuales se fundamenta su dene-gación. ... íd., págs. 11-15.
Define el Reglamento 5880 lo que constituye una Faci-lidad Existente y una Facilidad Nueva, en las Sees. 2-6 y 2-7, págs. 3-4, respectivamente, de la manera siguiente:
... Facilidad Existente significa un negocio en operación al momento que se radique debidamente la solicitud de Certifi-cación de Facilidad Exenta bajo la Sección 3 de este Regla-mento, que emprende una Renovación o Expansión Sustancial.
... Facilidad Nueva significa un negocio que califique como una Facilidad Exenta que no esté operando al momento que se radique la solicitud de certificación bajo la Sección 3 de este Reglamento, cuyo costo total exceda de quinientos mil dólares ($500,000), y que utilizará facilidades físicas y maquinarias que no hayan sido utilizadas en una facilidad de disposición y/o tratamiento de desperdicios sólidos durante el período de dieciocho (18) meses anteriores a la fecha de radicación de la solicitud. ... Asimismo, se considerará también como una Fa-cilidad Nueva a todo negocio que, aunque haya sido utilizado como una facilidad de disposición y/o tratamiento de desperdi-cios sólidos durante el referido período de dieciocho (18) me-ses, sea adquirido con el propósito de ser sometido a una re-novación de tal magnitud, incluyendo maquinaria y equipo, que su costo excederá del doscientos por ciento (200%) del pre-cio de compra del negocio, siempre y cuando dicha cantidad se invierta en su totalidad dentro del período de veinticuatro (24) meses de la fecha de la adquisición del mismo.
*736 Por último, para que una instalación que ha sido certi-ficada como exenta pueda recibir los beneficios de los cré-ditos contributivos, tiene que realizar una inversión elegi-ble, según se define en la Sec. 2-10 del Reglamento 5880 y la cual dispone en su parte pertinente:
Inversión Elegible significa:
(1) La cantidad de efectivo que haya sido aportada a una Facilidad Exenta para ser utilizada en una facilidad de dispo-sición y/o tratamiento de desperdicios sólidos a cambio de (i) acciones en una corporación, o (ii) participación en una socie-dad; y
Sólo se considerará como Inversión Elegible aquella inver-sión cuyos fondos son utilizados en su totalidad única y exclu-sivamente para la construcción, incluyendo el costo de equipo y maquinaria por la cual no se hayan otorgado créditos contri-butivos anteriormente, de una Facilidad Nueva o para la Re-novación o Expansión Sustancial, incluyendo el costo de equipo y maquinaria por la cual no se hayan otorgado créditos contributivos anteriormente, de una Facilidad Existente. Cualquier otra inversión cuyos fondos no sean utilizados directamente y en su totalidad para estos propósitos quedará excluida de la definición de Inversión Elegible de esta Sección.
En el caso de que se efectúe una de las aportaciones descri-tas en los incisos (1) o (2) de esta Sección, dicha aportación se considerará como Inversión Elegible sólo si se hace en la Emi-sión Primaria de las acciones o participaciones.
En todo caso en que se interese hacer una Inversión Elegible en una Facilidad Exenta en exceso de la cantidad provista en la Certificación de Facilidad Exenta, se requerirá una en-mienda a la Certificación de Facilidad Exenta que refleje la aportación de capital adicional. Como regla general, y a menos que la Facilidad Exenta sea de tal magnitud e importancia que los mejores intereses del Pueblo de Puerto Rico requieran lo contrario, el Director Ejecutivo sólo atenderá solicitudes de enmienda a Certificaciones de Facilidad Exenta que sean ra-dicadas antes del comienzo de la construcción o la Renovación o Expansión Sustancial de la Facilidad Exenta, y que sean motivadas por cambios sustanciales en el proyecto. Id., págs. 4-7.
*737 La Sec. 2-13 del Reglamento 5880, pág. 10, dispone los requisitos que deben cumplir aquellas “facilidades existen-tes” que deseen llevar a cabo una renovación:
Una Renovación o Expansión Sustancial significa aquella actividad que conlleva una inversión dirigida a renovar, remo-delar, o ampliar las facilidades físicas de una Facilidad Exis-tente, incluyendo la adquisición de maquinaria y equipo, siem-pre y cuando la Renovación o Expansión Sustancial: (i) conlleve un costo mínimo de doscientos cincuenta mil dólares ($250,000), [o] veinticinco por ciento (25%) del justo valor en el mercado de todos los activos de la Facilidad Existente, lo que sea mayor, y (ii) cuente con la aprobación previa del Director Ejecutivo.
Sobre las disposiciones legales pertinentes es necesario mencionar, por último, que tanto la Ley Núm. 70-1978 como el Reglamento 5880 conceden a la Autoridad la facul-tad de exigir informes mediante los cuales pueden investi-gar las operaciones de las facilidades exentas. Dispone el Art. 5 de la Ley Núm. 70-1978 en su inciso (ff), 12 L.RR.A. sec. 1305(ff), que la Autoridad puede “[r]equerir a toda persona o entidad sujeta a su jurisdicción que radique ante ella los informes y realizar [las] inspecciones o investiga-ciones necesarias para lograr los propósitos de [su ley orgánica]”.
Además, una vez concedido un crédito por inversión y notificado a la Autoridad cómo éste ha de ser distribuido entre los inversionistas, la “facilidad exenta” debe, por el término de tres años a partir de esa notificación, rendir un informe anual al Director de la Autoridad y al Secretario de Hacienda desglosando el total de la inversión realizada en el proyecto a la fecha en que se está rindiendo ese in-forme anual.
Del mismo modo, el Reglamento 5880 contiene disposi-ciones relativas a la capacidad que posee la Autoridad para solicitar esos informes de las industrias a las que regula. Por ejemplo, en la Sec. 13.1 del Reglamento se detalla con mayor especificidad la información que debe contener el *738 informe anual que viene obligada a rendir la entidad una vez ha recibido un crédito por inversión y ha notificado su distribución.
III

Interpretación de la ley

Con el fin de solucionar las controversias y adjudicar los derechos que cobijan a las partes en un pleito, los tribunales tenemos la ineludible labor de interpretar los estatutos aplicables a la situación de hechos en particular. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 241. Ese proceso de interpretar las leyes, que recibe el nombre de hermenéutica legal, consiste en auscultar, averiguar, precisar y determinar cuál era la voluntad legislativa al aprobar la ley. Id., pág. 241. La hermenéutica legal, así como las reglas que la rigen, se utiliza no sólo en la interpretación de los estatutos, sino también en la de los contratos, testamentos, reglamentos administrativos y cualquier otro tipo de documento. Id.
Al adentrarse en esa delicada faena, el Poder Judicial debe tener como norte que de todas las reglas de interpre-tación hay sólo una que es absolutamente invariable y es que en ese proceso “debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo”. (Enfasis en el original.) Bernier y Cuevas Segarra, op. cit, pág. 242. De ese modo, se ha establecido como principio esencial de la interpretación estatutaria que al lenguaje de la ley se le tiene que brindar aquel significado que le imprima validez al propósito que tuvo el legislador al aprobarla. Id., pág. 245.
El Código Civil de Puerto Rico contiene una serie de disposiciones dirigidas a guiar el análisis e interpretación correcta de las leyes. Dispone el Art. 14 del Código *739 Civil, 31 L.P.R.A. sec. 14, que cuando la letra de la ley es clara y está libre de toda ambigüedad, no debe ser menos-preciada, argumentando que se está tratando de cumplir con su espíritu. Sin embargo, lo anterior no significa que si nos encontramos ante un estatuto claro, este Tribunal se encuentre impedido de llevar a cabo su función como intér-prete de las leyes. En varias ocasiones hemos expresado que todas las leyes, tanto las claras como las oscuras, re-quieren de nuestra interpretación. Consejo Titulares v. DACo, 181 D.P.R. 945 (2011).
Acorde a lo anterior, previamente adoptamos el principio de hermenéutica que dispone que “ ‘al aplicar una ley siempre es necesario interpretarla. ... Eso es así ya sean oscuras o claras las palabras de la ley, por lo que se puede decir que es falso afirmar que sólo las leyes oscuras deben ser interpretadas’ ”. Consejo Titulares v. DACo, supra, pág. 958 (citando a Bernier y Cuevas Segarra, op. cit., pág. 259).
Embarcados en esa tarea de interpretar las leyes, si nos encontramos con una cuyo contenido resulta confuso, sin lugar a dudas cobra mayor importancia y se hace aún más latente la necesidad de indagar cuál ha sido la verdadera intención del legislador al aprobarla. En esas ocasiones de-bemos interpretar el estatuto considerando el propósito social que inspiró su creación y, teniendo ese propósito en mente, darle un sentido lógico a todas sus disposiciones. Alonso García v. S.L.G., 155 D.P.R. 91, 99-100 (2001). Nos ayudará en ese proceso considerar cuál era la naturaleza del problema o la necesidad existente que se procuraba atender mediante esa legislación. CBS Outdoor v. Billboard One, Inc. et al., 179 D.P.R. 391, 417 (2010).
Dispone el Art. 19 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 19, que cuando las expresiones de una ley son dudosas, el medio más eficaz para descubrir su verdadero sentido es considerar la razón y el espíritu de ella o los motivos que indujeron a la Legislatura a dictarla. *740 En Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 274 (2000) (citando a Goss, Inc. v. Dycrex Const. & Co., S.E., 141 D.P.R. 342 (1996)), sostuvimos:
Ante la letra de una ley ambigua o incierta tenemos la obli-gación de inclinarnos “hacia aquella solución que mejor capte el impacto del estatuto en términos del bienestar general y que mejor perciba la intención legislativa al adoptar la norma en-filada a propiciar el interés público”. (Citas omitidas y énfasis en el original.)
Hemos mencionado en innumerables ocasiones, que los tribunales, como intérpretes finales de las leyes, nos encontramos en la obligación de lograr un análisis que se ajuste al propósito y a la política pública que inspiró a la Legislatura al aprobarlas. Consejo Titulares v. DACo, supra, pág. 958. Esa normativa tiene como objetivo lograr que, finalmente, la determinación que el tribunal realice asegure el resultado que el legislador quiso obtener al aprobar la ley. Id., pág. 960. “Conforme con lo anterior, ... en situaciones en las que exista alguna ambigüedad, este Tribunal rechazará una interpretación literal y forzada de un texto legal que produzca un resultado que no puede haber sido el que intentó el legislador.” (Escolio omitido). Asoc. Fcias. v. Caribe Specialty et al. II, 179 D.P.R. 923, 939 (2010). Así hemos expresado que en aquellas ocasiones que nos encontramos con la letra de una ley que no es clara y cuya aplicación literal llevaría a un resultado absurdo o contrario a la verdadera intención del legislador, podemos, en nuestro proceso de interpretación, ignorar su contenido literal. Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231, 245 (2010).
En Orsini García v. Srio. de Hacienda, 177 D.P.R. 596, 612 (2009), expresamos:
A fin de cuentas, nadie puede comprender e interpretar la significación de cualquier legislación con la mera lectura de su texto, sin conocer el contexto histórico, cultural y social en el cual se aprobó. Se requiere, entonces, incluir en el análisis no *741 tan solo los elementos intrínsecos a la legislación, como son su exposición de motivos o sección de definiciones, sino también ciertos factores extrínsecos a ésta. Entre éstos, los tratadistas destacan: (1) los sucesos o puntos de vista contemporáneos a su aprobación; (2) la política y el orden público; (3) los infor-mes de la comisión legislativa que estudió el proyecto de ley; (4) el diario de sesiones, los anteproyectos, en fin, el historial legislativo; (5) la historia de la ley; (6) el momento de su apro-bación; (7) las realidades sociales, políticas y económicas en el momento de hacer la interpretación, y (8) las condiciones exis-tentes y costumbres arraigadas cuando se aprobó la ley. (18)
Por otro lado, hemos establecido que, depen-diendo del objetivo que las impulsa, las leyes se interpre-tan de manera distinta. Así, dispusimos en Orsini García v. Srio. de Hacienda, supra, pág. 614 que:
... Si el objetivo legislativo es beneficiar a los individuos, al Estado o reparar alguna situación de injusticia en particular, la interpretación deberá ser liberal. Por el contrario, si el ob-jetivo está dirigido a limitar los derechos del Estado o de la sociedad en general, la interpretación debe ser restrictiva. La idea de estas formas de interpretación es facilitar que se cum-pla con la finalidad de cada legislación.
Por último, hemos manifestado que al cumplir con nuestra función como intérpretes de las leyes, tenemos que armonizar, siempre que sea posible, todos aquellos es-tatutos involucrados en la solución de la controversia, de modo que se obtenga un resultado sensato, lógico y razonable. Asoc. Fcias. v. Caribe Specialty et al. II, supra, pág. 940.
IV

Interpretación de las leyes contributivas

En innumerables ocasiones hemos señalado que los tribunales no debemos interpretar la legislación contri-butiva de forma extensiva, sino en forma justa de acuerdo *742 con sus propios términos. Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559 (2001). Del mismo modo, hemos expresado que: “las exenciones contributivas, por ser privi-legios excepcionales que concede el Estado, no deben ex-tenderse más allá de los términos expresos y exactos del estatuto que las otorga y toda duda debe resolverse en contra de la existencia de la exención.” Id., págs. 559-560.
Sin embargo, también hemos establecido que, aun cuando “las leyes fiscales deben ser interpretadas restrictivamente, las mismas tienen que ser interpretadas en forma jurídica y razonable, teniendo en mente el propósito e intención general del legislador al aprobarlas”. (Enfasis en el original.) Roque González & Co. v. Srio. de Hacienda, 127 D.P.R. 842, 856-857 (1991). Recientemente, manifestamos que esas leyes “no deben ser interpretadas tan restrictivamente como para que pueda quedar frustrada la intención legislativa”. Interior Developers v. Mun. de San Juan, 177 D.P.R. 693, 707 (2009). Además, indicamos en Orsini García v. Srio. de Hacienda, supra, pág. 616, que “las exenciones contributivas no se interpretarán restrictivamente si la intención legislativa de concederlas es clara e inequívoca, pues ello derrotaría el propósito del estatuto”. (Escolio omitido.)
Hemos abundado sobre el particular al exponer:
[L]as exenciones industriales de contribuciones que concede el Gobierno de Puerto Rico no deben interpretarse como las an-tiguas exenciones contributivas las cuales eran privilegios, por cuya razón era beneficioso al interés público interpretarlos restrictivamente. Por el contrario, las exenciones industriales de contribuciones deben interpretarse en forma consonante con su principio creador. Sólo así se cumple la intención legis-lativa y además esa interpretación fiel y razonable es la inter-pretación beneficiosa al interés público. La exención industrial de contribuciones no es una gracia, en el viejo sentido de la frase, que el Gobierno de Puerto Rico confiere sino que es un instrumento que utiliza Puerto Rico, para fomentar la indus-tria y la inversión productiva .... (Citas y énfasis omitido.) Textile Dye Works, Inc. v. Srio. de Hacienda, 95 D.P.R. 708, 713 *743 (1968). Véanse, además: Pfizer Pharm. v. Mun. de Vega Baja, 182 D.P.R. 267, 280 (2011); P.R. Int. Paper Co. v. Srio. de Hacienda, 100 D.P.R. 131, 135 (1971).
En Proctor Mfg. Corp. v. Srio. de Hacienda, 91 D.P.R. 829, 835 (1965) (citando a Club Yaucano v. Srio. Hacienda, 83 D.P.R. 623, 629 (1961)), en lo atinente a la regla de interpretación restrictiva de las exenciones contributivas, aclaramos que:
"... [N]o significa que la ley tenga que ser interpretada con un celo de necesaria exclusión de los beneficios que concede la exención, sino meramente que no debe extenderse más allá del propósito legislativo discernible ..., o sea, que la interpreta-ción no puede ser tan estrecha y literal que derrote el propó-sito mismo del estatuto .... Todo cuanto se requiere es que la interpretación sea razonable.”
V

Revisión judicial de las decisiones administrativas

La revisión judicial de las decisiones administrativas tiene como finalidad servir de control a la discreción concedida a las agencias administrativas, asegurando, de ese modo, que ejerzan sus funciones conforme a la ley y de forma razonable. Empresas Ferrer v. A.R.Pe., 172 D.P.R. 254, 264 (2007). Mediante este mecanismo procesal se les provee a los ciudadanos un foro al cual acudir para obtener remedios y vindicar derechos frente a las actuaciones de los organismos administrativos. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 435 (1997). Por su intención, la revisión judicial le “impone una obligación especial a los tribunales de ser especialmente cuidadosos en revisar las decisiones en este campo para proteger la ciudadanía contra posibles actuaciones arbitrarias”. íd., pág. 435 (citando a Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218, 223-224 (1974)). Así, hemos expresado sobre este particular:
*744 “[L]os tribunales tenemos el deber de fiscalizar rigurosa-mente las decisiones de dichas agencias, para asegurar que desempeñen cabalmente sus importantísimas funciones, y para que el País no pierda la fe en sus instituciones de gobierno.” JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177, 186 (2009) (citando a Empresas Ferrer v. A.R.Pe., supra, págs. 263-264).
La Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. see. 2101 et seq., provee los parámetros que han de guiar la revisión judicial de las determinaciones administrativas al establecer en su See. 4.5 (3 L.P.R.A. sec. 2175), que las determinaciones de hechos serán sostenidas por el tribunal, si están basadas en evidencia sustancial obrante en el expediente administrativo y que las conclusiones de derecho serán revisables en todos sus aspectos. Esa sección dispone, además, que el tribunal concederá el remedio apropiado, de determinar que el peticionario es acreedor de éste.
De ordinario, los tribunales le otorgamos deferencia a las determinaciones realizadas por las agencias administrativas, basado en la premisa de que son éstas las que poseen el conocimiento especializado sobre los asuntos que estatutariamente le han sido encomendados. Torres Santiago v. Depto. Justicia, 181 D.P.R. 969, 1002 (2011); Mun. de San Juan v. CRIM, 178 D.P.R. 163, 175 (2010). Por ello, hemos señalado que “una decisión administrativa goza de una presunción de legalidad y corrección que debe respetarse, mientras la parte que las impugna no demuestre con suficiente evidencia que la decisión no está justificada”. JP, Plaza Santa Isabel v. Cordero Badillo, supra, pág. 187.
Sin embargo, en Empresas Ferrer v. A.R.Pe., supra, pág. 264, expresamos las instancias en las cuales la deferencia que consistentemente le hemos reconocido a las agencias debe ceder. Estas son:
... (1) la determinación administrativa no está basada en *745 evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o los re-glamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúa arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) cuando la actuación administrativa lesiona de-rechos constitucionales fundamentales .... (Citas omitidas.)
Distinto a la deferencia que se le concede a las agencias administrativas al formular las determinaciones de hechos, cuando de conclusiones de derecho se trata, los tribunales tenemos una amplia facultad de revisarlas completa y absolutamente. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra, págs. 435-436. Los tribunales sostendrán las conclusiones de derecho del organismo administrativo siempre que sean conformes al mandato de la ley. Martínez v. Rosado, 165 D.P.R. 582, 589 (2005).
Además de la deferencia que se le brinda a las determinaciones de hechos enunciadas por las agencias administrativas, hemos establecido que los tribunales igualmente le guardamos mucho respeto a las interpretaciones de los estatutos que sean realizadas por las agencias, como entes facultados para velar por su administración y cumplimiento. Torres Santiago v. Depto. Justicia, supra, pág. 1003.
Sin embargo, también establecimos que la norma anterior “no constituye un dogma inflexible que impid[a] la re-visión judicial si no existen las condiciones que sostienen la deferencia”. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra, pág. 436. Así, hemos sostenido que cuando la inter-pretación del estatuto realizada por la agencia produzca resultados que son incompatibles o contrarios al propósito para el cual se aprobó la legislación y a su política pública, el criterio administrativo no podrá prevalecer. Orsini García v. Srio. de Hacienda, supra, pág. 642. Es decir, la defe-rencia judicial al expertise administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que con- *746 duzcan a la comisión de una injusticia. Asoc. Fcias. v. Caribe Specialty et al. II, supra, págs. 941-942; Mun. de San Juan v. CRIM, supra, págs. 175-176.
Citando al Catedrático Dr. Demetrio Fernández Quiño-nes, en Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra, pág. 436, abundamos sobre este particular como sigue:
“Ahora bien, la deferencia que se preste debe estar predi-cada realmente en un peritaje superior demostrado por la agencia. Si las decisiones de las agencias no cumplen con esas expectativas, entonces es necesaria una mayor participación de los tribunales. Tal incumplimiento justifica la intervención judicial porque pone de manifiesto que hay falta de entendi-miento del objetivo y de la política pública a ser alcanzada y desarrollada por el organismo administrativo. D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Ad-ministrativo Uniforme, Bogotá, Ed. Forum, 1993, pág. 505.” (Énfasis nuestro.)
En conclusión, “los tribunales no [podemos] imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables o ilegales, o simplemente, contrarias a derecho”. Empresas Ferrer v. A.R.Pe., supra, pág. 264.
Una vez establecido el derecho aplicable al caso, proce-demos a adjudicar las controversias planteadas.
VI
A. Certificación como facilidad exenta
Establece el Art. VI, Sec. 19 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 440, que será política pública del Gobierno de Puerto Rico “la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el bene-ficio general de la comunidad”. Lamentablemente, y según podemos constatar con frecuencia en nuestros medios in-formativos, en Puerto Rico estamos viviendo un problema, *747 a gran escala, por la cantidad de basura que se genera a diario.
Precisamente, el recurso ante nuestra consideración tiene como base cuestionamientos procesales sobre una de las estrategias desarrolladas por el Gobierno para lidiar con tan precaria situación.
Reconociendo el reciclaje como una de las alternativas que de forma más efectiva podía ayudar a reducir la acu-mulación desmedida de desperdicios sólidos en los pocos vertederos operantes en Puerto Rico,(19) el 18 de septiem-bre de 1992, la Asamblea Legislativa aprobó la Ley para la Reducción y el Reciclaje de los Desperdicios Sólidos en Puerto Rico.(20) Mediante esta, estableció como política pú-blica del Gobierno de Puerto Rico la implantación de estra-tegias económicamente viables y ambientalmente seguras que resultaran en la disminución del volumen de los des-perdicios sólidos, entre las que destacó el reciclaje.(21)
Posteriormente, mediante la Ley Núm. 15-1995, se pre-tendió solidificar la estrategia del reciclaje, mediante in-centivos a la industria privada en el desarrollo y la implan-tación de instalaciones de reducción, disposición y/o tratamiento de desperdicios sólidos. De las exposiciones de motivos, al igual que el historial legislativo de las disposi- *748 ciones legales mencionadas, se desprende que la política pública del Gobierno de Puerto Rico, así como lo que se pretendió lograr con la creación de ambas legislaciones, fue la implantación de un programa efectivo de reducción y reciclaje de desperdicios sólidos.
Con lo anterior como trasfondo, comenzamos aclarando que, en el caso de autos, la Autoridad en su comparecencia ante este Tribunal, hizo unas aseveraciones en su primer señalamiento de error que no son correctas. Señaló que el TA había reconocido el derecho a un crédito del cincuenta por ciento (50%) de las aportaciones realizadas por los in-versionistas a las plantas de reciclaje sin tener que cualifi-cárseles como “facilidades exentas”.
Efectivamente, de un examen de las leyes pertinentes al caso ante nos se desprende que el propósito de la Legisla-tura al aprobarlas fue incluir a las empresas privadas como un componente importante en la disposición y el pro-cesamiento de los desperdicios sólidos. Para lograrlo esta-bleció, como materia de derecho, un incentivo de créditos contributivos a aquellas “facilidades exentas” que realiza-ran inversiones destinadas a reducir, disponer o tratar los desperdicios sólidos.
En su apreciación, el TA correctamente reconoció el be-neficio de los créditos contributivos como un derecho. Sin embargo, contrario a lo alegado por la Autoridad, de la sen-tencia emitida por el TA no se desprende que ese derecho proceda en ausencia de una certificación como “facilidad exenta”.
Es decir, en ningún momento el TA aseveró que a las industrias que llevaran a cabo actividades relacionadas a la disposición y procesamiento de los desperdicios sólidos le correspondía ese derecho de manera automática. Según lo anterior y las disposiciones legales pertinentes, cualquier entidad que desee recibir los beneficios de los créditos con-tributivos y que no haya sido certificada como facilidad exenta, tiene que, ineludiblemente, ser certificada como *749 exenta para ser acreedora de éstos. Sin embargo, como ve-remos más adelante en nuestra discusión, una vez certifi-cada, va a depender de la naturaleza de los proyectos que la entidad vaya a llevar a cabo para renovar o expandir sus instalaciones, si tuviera que pasar de nuevo por el proceso de certificación. Por lo tanto, el TA no cometió el primer error señalado por la Autoridad.
En cuanto al segundo señalamiento de error, la peticio-naria alega que IFCO tenía que certificarse nuevamente como “facilidad exenta” para obtener los nuevos créditos contributivos solicitados. Sin embargo, de una evaluación de las disposiciones legales pertinentes podemos concluir que no es lógica, ni razonable la interpretación que la Au-toridad pretende hacer de éstas para llegar a tal determinación.
Sin lugar a dudas, no puede ser cónsono con los motivos que propiciaron la aprobación de la Ley Núm. 70-1978 y con el Reglamento 5880, el requerir que IFCO vuelva a pasar por el proceso de solicitar una certificación como “fa-cilidad exenta” para recibir créditos fundamentados en una renovación dirigida a realizar precisamente el mismo tipo de actividad por la que fue certificada inicialmente. ¿Cómo puede la Autoridad fomentar e incentivar la participación de la industria privada en el reciclaje requiriéndole que cada vez que vaya a realizar una renovación o expansión sustancial de sus instalaciones, tenga que pasar por el pro-ceso completo de certificación como “facilidad exenta”, re-querido a cualquier otra entidad que recién comienza ope-raciones?
La Autoridad sustenta sus alegaciones en las menciones que aparecen en las disposiciones de la See. 3 del Regla-mento 5880, pág. 11, relativas a las instalaciones existentes. Sin embargo, al evaluar esas disposiciones en-tendemos que resulta más razonable y más acorde con la política pública reconocida y con los motivos que alentaron la aprobación de la Ley Núm. 70-1992, Ley Núm. 15-1995 *750 y Ley Núm. 104-1996,(22) la conclusión de que a quienes se refiere esa sección de la ley con el término “facilidades exis-tentes” es a aquellas industrias en operación, que no han sido previamente certificadas y que planifican llevar a cabo una renovación o expansión sustancial de sus instal-aciones. Lo anterior va respaldado por la definición de “fa-cilidad existente” de la See. 2-6 del Reglamento 5880, pág. 6, la cual indica que se refiere a aquellos negocios en ope-ración, al momento de presentar la certificación de “facili-dad exenta” al amparo de la See. 3 del Reglamento, que van a emprender una renovación o expansión sustancial.
Para lograr armonizar los propósitos que propiciaron las legislaciones pertinentes al caso de autos, con las dis-posiciones del Reglamento 5880, no cabe conclusión más lógica que considerar las “facilidades existentes” a las que se refiere la See. 3 del Reglamento 5880 como aquellas in-dustrias en operación que no han sido certificadas como “facilidades exentas”, pero que desean ser certificadas como tal para recibir los créditos contributivos por una re-novación que habrá de realizarse. Esa interpretación sería la única que le daría sentido a los fines que se pretenden alcanzar con la adopción de los créditos contributivos por inversión en instalaciones de reciclaje.
Acorde con lo anterior, el TA se expresó en los términos siguientes, con relación a las industrias que han sido cer-tificadas como exentas y que van a llevar a cabo una reno-vación o expansión sustancial:
*751 [E]s razonable que se examine la naturaleza de la operación que obtuvo la Certificación de Facilidad Exenta y se compare con la de la expansión propuesta. Si no se discierne un cambio significativo, entonces no existe razón para requerir que se repita el proceso de calificar como Facilidad Exenta. Si se de-termina que la actividad es diferente, la Autoridad debe expo-ner el fundamento para dicha conclusión y entonces proceder a solicitar que se le demuestre que la expansión debe calificar bajo los requisitos de “Facilidad Exenta” .... El concepto de renovación incluye el utilizar una tecnología más adelantada o eficiente. Por lo tanto, lo fundamental es examinar si la ope-ración mantiene la naturaleza de transformar insumos (“inputs”) de desperdicios sólidos a material reciclable.
Nos resulta claro, que sólo cuando se concluye que la expan-sión envuelve una actividad diferente, es que procedería eva-luar una propuesta de expansión bajo los criterios necesarios para calificar como una Facilidad Exenta. Si no existe tal diferencia, entonces lo que procede es indagar si el proyecto de expansión llena lo requerido por el Reglamento en la “Sección 2-13 Renovación o Expansión Sustancial”. El volver a calificar el proyecto de expansión o renovación como una Facilidad Exenta, cuando no existe cambio de la actividad por la cual antes se calificó la facilidad como Facilidad Exenta, no lo au-toriza ni requiere la ley y, además, conlleva una demora y gastos adicionales que no se justifican cuando la naturaleza de la operación es la misma que la del proyecto original, el cual luego de evaluación por la Autoridad obtuvo Certificación de Facilidad Exenta. (Énfasis en el original.) Sentencia del TA, págs. 21-23.
Entendemos acertada la conclusión a la que llega el TA y coincidimos con su interpretación en torno a que solo en aquellos casos en los cuales la “facilidad exenta” va a rea-lizar una actividad distinta a aquella por la cual se le con-cedió el certificado de exención contributiva, es que resulta meritorio que se vuelva a evaluar y a cualificar como tal.
Cabe señalar que IFCO fue certificada como “facilidad exenta” en virtud de lo dispuesto en el inciso (c) de la See. 2-5 del Reglamento 5880 y en el inciso (g) del Art. 21 de la Ley Núm. 70-1978. Según esos preceptos, la Autoridad ve-rificó lo siguiente: (1) que sus actividades estuvieran en armonía con el Plan Regional de Infraestructura para el Reciclaje y Disposición de los Desperdicios Sólidos, (2) que *752 promovieran la reducción, el reúso y reciclaje de los desper-dicios sólidos, (3) que se utilizara una tecnología ambien-talmente segura y probada, y (4) que se cumpliera con to-das las reglamentaciones estatales y federales aplicables. Además, IFCO tuvo que someter todos y cada uno de los documentos exigidos por la See. 3 del Reglamento 5880. Resulta, pues, evidente que, para obtener su certificado de exención contributiva IFCO ya fue sometida anteriormente a una evaluación rigurosa por parte de la Autoridad, por lo que no es meritorio ni razonable que tenga que volver a ser cualificada por una expansión dirigida a realizar precisa-mente el mismo tipo de actividad que ya realizaba.
Como bien expresara el TA en su Sentencia:
[E]l requerir que mía propuesta de expansión de una Facili-dad ya exenta se evalúe bajo los criterios necesario [s] para obtener una Certificación de Facilidad Exenta, convertiría el proceso de expansión en uno aún más oneroso que uno original, pues, además de los requisitos para Facilidad Exenta original, la expansión tiene que cumplir con el requisito particular de la Sección 2-13 del Reglamento, ante, como Expansión Sustancial, lo cual le impone un requisito de un tamaño mí-nimo al proyecto, que no existe ni requiere al evaluarse el proyecto original. Ello resulta en la anomalía de que un pro-yecto de expansión, el cual usualmente es un apéndice más pequeño que el original, requeriría de requisitos más onerosos para su aprobación, que el proyecto original. Se trata de un absurdo .... (Énfasis en el original y citas omitidas.) Sentencia del TA, págs. 23-24.
Esto no quiere decir, sin embargo, que IFCO no tenga que cumplir con una serie de requisitos ni tenga que ser sometida a unas evaluaciones para recibir los créditos que está solicitando por la renovación o expansión sustancial. Como bien se desprende de la citada determinación del foro apelativo intermedio, para recibir los créditos por la expansión sustancial IFCO tendría que, de todos modos, cumplir con las disposiciones de la Sec. 2-13 del Regla-mento 5880, pág. 10.
Al llegar a este punto, es menester señalar que el Re- *753 glamento 5880, por contener asuntos de carácter fiscal, fue también aprobado por el Departamento de Hacienda. De ese modo, es forzosa la conclusión de que el Secretario de Hacienda se encontraba y se encuentra en la misma posi-ción que la Autoridad para interpretar sus disposiciones. De acuerdo con lo anterior, el 15 de abril de 2005, el Secre-tario de Hacienda suscribió una carta en respuesta a la solicitud de enmienda a la certificación sometida por IFCO, en la que reconoció que para obtener esos créditos, el procedimiento que IFCO tenía que completar era aquel requerido en la Sec. 2-13 del Reglamento 5880. En lo per-tinente, manifestó en su comunicación lo siguiente:
Luego de evaluar la solicitud presentada por la Peticionaria consideramos que la misma debe evaluarse bajo las disposicio-nes de la Sección 2-13 del Reglamento 5880, como una expan-sión de las operaciones de la Peticionaria y no como una en-mienda a la Certificación, según fue solicitado. (Enfasis nuestro.)
De otro lado, queremos dejar claro que con nuestra de-cisión no estamos abandonando la norma de deferencia judicial que se le concede a las interpretaciones que realicen las agencias administrativas de sus leyes orgánicas. Debe-mos tener presente que se trata de una situación particular en la cual la agencia está realizando una interpretación de su propio reglamento, el cual contiene un lenguaje que resulta ambiguo y confuso. Ante estas circunstancias, no tenemos otra alternativa que guiarnos por las normas de interpretación estatutaria, esbozadas anteriormente, que nos dirigen hacia la consideración del propósito o la inten-ción que perseguía la Legislatura al aprobar esa legislación.
Como indicáramos, el propósito social por el cual se aprobó la disposición relativa a la concesión de créditos contributivos, y las enmiendas posteriores a esta, iba diri-gido a flexibilizar y promover que más industrias privadas participaran en la ardua tarea que representa el manejo de *754 los desperdicios sólidos. Requerir que IFCO vuelva a pasar por el proceso de certificación para recibir los créditos por una expansión dirigida a realizar la misma actividad que realizaba antes, va a todas luces en contra del motivo con el cual se aprobó la legislación en cuestión.
Además, es de todos conocido que los reglamentos administrativos no pueden ir contra lo que la Legislatura pretendió atender con la aprobación de la ley. Es decir, “un reglamento promulgado para implementar la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta”. P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 409 (1980).
Cónsono con lo anterior, y según señaláramos, uno de los propósitos de la revisión judicial es asegurar que los orga-nismos administrativos actúen en forma compatible con la política pública legislativa. Es por esa razón que expresa-mos recientemente en Báez Rodríguez v. E.L.A., supra, pág. 245 que “cuando el objeto de interpretación es una en-mienda a la ley, debemos siempre tener en cuenta que no podemos imputar a la Asamblea Legislativa la realización de un acto inútil al haberla aprobado”. Así, cuando se en-mendó la Ley Núm. 70-1978 para reconocer el derecho a la obtención de créditos contributivos a cierto tipo de indus-trias, se hizo con el propósito de promover e incentivar la operación de más industrias privadas en las operaciones de reciclaje y manejo de desperdicios sólidos y no para crearle trabas en la instalación y expansión de sus operaciones.
Debemos tener presente que, después de todo, la decisión que hoy tomamos, además de estar a favor de la política pública de desarrollar un programa amplio de reciclaje —que incluya la participación activa de la industria priva-da— no representa una amenaza a las facultades y a los poderes de la Autoridad. Por el contrario, la Autoridad, se-gún disposiciones de su Ley Orgánica y del Reglamento 5880, tiene la potestad de exigir informes a todas aquellas industrias que estén participando en el manejo de los des- *755 perdidos sólidos. Ésta sirve como herramienta útil para mo-nitorear y mantener un control efectivo para asegurar que esas entidades estén llevando a cabo las actividades por las cuales se les certificó como “facilidad exenta” y que sirvieron de base para el beneficio de los créditos contributivos.
Sin lugar a dudas, la preparación de informes repre-senta un requisito mucho menos oneroso que tener que cumplimentar el engorroso proceso de cualificar como “fa-cilidad exenta”, cada vez que una va a llevar a cabo una expansión o renovación de sus operaciones. Al ser certifica-das inicialmente como exentas, ciertamente estas indus-trias tuvieron que atravesar un proceso de evaluación de sus operaciones para ser acreedoras de los beneficios de los créditos contributivos.
Además, a pesar de lo que resolvemos hoy, todavía las entidades concernidas tendrán que pasar por un proceso de evaluación para lograr obtener créditos contributivos por expansiones o renovaciones sustanciales. Esto es, todavía IFCO tendría que demostrar que su inversión es elegible porque: (1) se trata de una cantidad de efectivo a ser apor-tada a una “facilidad exenta” a cambio de acciones en la corporación o participación en la sociedad; (2) se está apor-tando capital adicional al negocio y no meramente rempla-zando capital ya existente (emisión primaria); (3) la inver-sión ha de ser utilizada única y exclusivamente para la construcción, incluyendo el costo de equipo y materiales para los cuales no se han otorgado créditos contributivos anteriormente; (4) la inversión está dirigida a renovar, re-modelar o ampliar las instalaciones físicas y (5) la inver-sión conlleva un costo mínimo de doscientos cincuenta mil dólares ($250,000) o veinticinco por ciento (25%) del justo valor en el mercado de todos los activos de la instalación existente, lo que sea mayor.
En el caso de autos, los esfuerzos de IFCO iban dirigidos precisamente a ampliar y renovar sus instalaciones físicas, mediante una inversión adicional de efectivo, la cual ha- *756 bría de ser utilizada única y exclusivamente en la compra de materiales y equipos nuevos y en el desarrollo de nue-vas instalaciones. Además, la inversión ascendía a cinco millones cien mil dólares ($5,100,000), es decir, mayor al veinticinco por ciento (25%) de todos los activos de IFCO y anteriormente no se habían otorgado créditos contributivos por ésta.
Si lo que ha pretendido la ley es incentivar la participa-ción de la industria privada en la solución de un problema que nos afecta a todos —como lo es la producción de tone-ladas de desperdicios sólidos diariamente y la escasez de vertederos donde almacenarlas— no podemos justificar los requerimientos de la Autoridad de hacerle el camino más tortuoso a una industria que, al ampliar sus operaciones, contribuye a erradicar tan preocupante problema.
Después de todo, y aún con toda la deferencia que se le concede a las agencias administrativas por su conoci-miento especializado, debemos tener presente que es final-mente a los tribunales y en especial a esta Curia, a quien le corresponde evaluar las actuaciones administrativas para determinar si se ajustan al ámbito prescrito en su ley habilitadora. López Leyro v. E.L.A., 173 D.P.R. 15, 24—25 (2008). Sin duda alguna, y en cumplimiento con esa mi-sión, velaremos por que “las interpretaciones que las agen-cias realicen de sus propios reglamentos [estén amparadas] en la razón y en la afinidad con sus leyes habilitadoras”. Id., pág. 26. A fin de cuentas “no se trata de aplicar con lógica mecánica determinada interpretación, sino de formular aquella que sea cónsona con las necesida-des contemporáneas de nuestra sociedad y con la intención original de la ley según fue aprobada”. Id., pág. 27. En definitiva, “no pod[e]mos ignorar que las leyes se aprueban con un fin”, por lo que “[n]o debemos reducirlas a la futili-dad mediante interpretaciones textuales que trunquen su fuerza y propósito”. Id., pág. 27.
*757 Por lo tanto, no erró el TA al determinar que IFCO no tiene que ser calificada ni evaluada nuevamente como “fa-cilidad exenta” para poder recibir créditos contributivos por la renovación o expansión sustancial que habrá de rea-lizarse, dado que ésta había obtenido un certificado de exención contributiva previamente.
B. Elegibilidad de la inversión
Finalmente, en su tercer señalamiento de error, la Au-toridad aduce que la inversión que IFCO habrá de realizar no es elegible para recibir los créditos contributivos. Esta sustentó su determinación en: (1) el hecho de que la opera-ción e infraestructura de IFCO es similar a la de otras industrias existentes en el país, (2) que ya habían recibido sobre dos millones doscientos mil dólares ($2,200,000) en créditos contributivos, y (3) que el área de estacionamiento que habría de construirse no estaba relacionada con la ac-tividad de reciclaje.
Los únicos requisitos que se desprenden de la Ley Núm. 70 y del Reglamento 5880 para que una inversión pueda catalogarse como elegible es que la misma vaya a ser uti-lizada en su totalidad, única y exclusivamente en una ins-talación de disposición y/o tratamiento de desperdicios só-lidos y que anteriormente no se hayan otorgado créditos contributivos por esa nueva inversión. Por lo tanto, ni en la ley ni en el Reglamento existen limitaciones en cuanto a la cantidad de créditos que han de concederse, ni sobre con-sideraciones de índole geográficas. Además, si considera-mos la cantidad de desperdicios sólidos que recibe una planta de reciclaje y la cantidad que igualmente se genera entre el producto reciclado y el remanente, es evidente que la inversión en contenedores y en áreas donde recibir y estacionar los camiones con desperdicios sólidos está in-trínsecamente relacionada con la actividad de reciclaje.
En conclusión, la Autoridad no presentó en su resolu-ción razones válidas en apoyo de su determinación. Ade- *758 más, de un análisis exhaustivo de la Ley Núm. 70-1978 y del Reglamento 5880, no se desprenden disposiciones que sirvan como base para tal dictamen. En consecuencia, con-cluimos que la determinación de que la inversión que ha de realizarse por IFCO no era elegible para los créditos con-tributivos, es irrazonable y arbitraria.
Por lo tanto, no erró el TA al resolver que la inversión adicional que realizaría IFCO en la renovación o expansión de su empresa es elegible para recibir los créditos contri-butivos que dispone el Art. 21 de la Ley Núm. 70-1978 y el Reglamento 5880.
VII
El incentivo a las industrias privadas para que éstas participen en la reducción, la disposición y el tratamiento de desperdicios sólidos, además de contribuir a la solución de un problema ambiental de gran magnitud, ayuda al Go-bierno a cumplir con su política pública, a la vez que reduce el expendio de los fondos designados para esos fines. La interpretación que realice la Autoridad de su regla-mento no puede ser incompatible con la política pública plasmada en la ley. Es a la Rama Legislativa a quien co-rresponde establecer los asuntos fundamentales de política pública y los directores de las agencias y entidades de la Rama Ejecutiva vienen obligados a interpretar esas leyes de modo compatible con los propósitos que tuvo la Legisla-tura al aprobarlas.
Por las razones expuestas, se confirma la Sentencia del Tribunal de Apelaciones.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez se inhibió.

 12 L.P.R.A. sec. 1318a.

 Mejor conocida como Ley de la Autoridad de Desperdicios Sólidos en Puerto Rico (Ley Núm. 70-1978), 12 L.P.R.A. see. 1301 eí seq.).

 El Reglamento 5880 es el “Reglamento promulgado para gobernar las condi-ciones para la concesión de créditos por inversión en una facilidad exenta a tenor con las disposiciones del Artículo 21 de la Ley de la Autoridad de Desperdicios Sólidos en Puerto Rico, Ley Núm. 70 de 23 de junio de 1978, según enmendada”.

 El 12 de abril de 1999 la Autoridad expidió a IFCO un “Certificado de Faci-lidad Exenta y Crédito Contributivo” (Certificación) en el caso Núm. ADS-70-97-4.

B) Cuando IFCO fue certificada inicialmente, sus actividades se limitaban al reciclaje parcial de papel y cartón. Posteriormente, en octubre de 2001 se enmendó la exención contributiva para incluir el reciclaje parcial de plástico, vidrio, aluminio, metales ferrosos y cualquier otro material reciclable.

 Conocida como Ley de Incentivos Contributivos de 1998.

 Conforme a las disposiciones de la Ley Núm. 70-1978, la cantidad máxima de crédito por inversión que estará disponible a los inversionistas y a los participantes será de cincuenta por ciento (50%) del efectivo aportado por éstos como inversión elegible a la “facilidad exenta”. 12 L.P.R.A. sec. 1318a(b).

 La Autoridad basó su determinación en la Sec. 2-10 del Reglamento 5880, pág. 7, el cual dispone lo siguiente, en su parte pertinente:
“En todo caso en que se interese hacer una Inversión Elegible en una Facilidad Exenta en exceso de la cantidad provista en la Certificación de Facilidad Exenta, se requerirá una enmienda a la Certificación de Facilidad Exenta que refleje la apor-tación de capital adicional. Como regla general, y a menos que la Facilidad Exenta sea de tal magnitud e importancia que los mejores intereses del Pueblo de Puerto Rico requieran lo contrario, el Director Ejecutivo sólo atenderá solicitudes de en- *721 mienda a Certificaciones de Facilidad Exenta que sean radicadas antes del comienzo de la construcción o la Renovación o Expansión Sustancial de la Facilidad Exenta, y que sean motivadas por cambios sustanciales en el proyecto.”

 La primera enmienda para extender el tiempo se aprobó el 11 de octubre de 2000, mediante la cual se le concedieron dieciocho meses adicionales, es decir, hasta el 12 de abril de 2002. La Autoridad extendió en tres ocasiones adicionales, a solici-tud de IFCO, la fecha para el comienzo de operaciones. La última aprobación es de 30 de enero de 2004.

 Esa determinación fue notificada mediante carta fechada 16 de febrero de 2006.

 Según las disposiciones del Reglamento 5880, entendemos que la sección a la que se refería la recurrida era la See. 2-5, en lugar de la Sec. 2-10.

 Archivada en autos y notificada a las partes el 12 de enero de 2007.

 Refiriéndose a la Sec. 2-13 del Reglamento 5880.

 Conocida como Ley para la Reducción y el Reciclaje de Desperdicios Sólidos en Puerto Rico.

 13 L.P.R.A. sec. 10039(e)(24).

 13 L.P.R.A. sec. 10101(d)(9) y (e)(24).

 Añadido a la Ley Núm. 70-1978 mediante enmienda realizada por la Ley Núm. 233-2006.

 Bernier y Cuevas Segarra, op. cit, págs. 242-243 y 369-386.

 Valga señalar que en 1994 la Agencia Federal de Protección Ambiental (EPA) y la Junta de Calidad Ambiental (JCA) cerraron 32 de los 61 vertederos que operaban a esa fecha, por incumplimiento con los estándares ambientales. “Estos cierres tuvieron como resultado reducir a casi la mitad la cantidad de [vertederos] disponibles para la disposición de los desperdicios sólidos en Puerto Rico.” Resolución sobre Aclaratoria e Interpretación de Política Pública aplicable a los Sistemas de Relleno Sanitario, R-ll-16-5, aprobada por la Junta de Calidad Ambiental el 30 de septiembre de 2011.

 Ley Núm. 70-1992.

 Es menester señalar que a pesar de que desde 1992 se estableció el reciclaje como uno de los métodos principales en los asuntos de la política pública ambiental, recientemente entró en vigor la Resolución 11-16-5 de la JCA que tiene como meta ulterior elevar la tasa de reciclaje en la Isla, debido a que presuntamente este es actualmente de aproximadamente once punto tres por ciento (11.3%), cuando según las disposiciones de la Ley Núm. 70-1992 debía haber sido de un treinta y cinco por ciento (35%). Resolución sobre Aclaratoria e Interpretación de Política Pública apli-cable a los Sistemas de Relleno Sanitario, R-ll-16-5, aprobada por la Junta de Ca-lidad Ambiental el 30 de septiembre de 2011.

 Cabe señalar que, a tono con esa política pública, en la Exposición de Moti-vos de la Ley Núm. 135-1997 (1997 (Parte 1) Leyes de Puerto Rico 636-637), de acuerdo con la cual se conceden los créditos contributivos por inversión del Art. 2Í de la Ley Núm. 70-1978, se expresó lo siguiente:
“[L]os modelos económicos a nivel mundial han cambiado significativamente en los últimos años, por lo que es necesario adoptar unos nuevos incentivos contributi-vos y no contributivos que estén más a tono con las necesidades cambiantes de la industria para asegurar que Puerto Rico se mantenga competitivo a nivel mundial como localización de los negocios.
“Además de reducir los costos de hacer negocios en Puerto Rico, en términos generales, es necesario reducir la burocracia y la complejidad del programa de in-centivos para el desarrollo económico de Puerto Rico ...” (Enfasis nuestro.)